IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| JUSTIN TRUDEAU, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Civil Action No. _____ |
| | § | |
| UNIVERSITY OF NORTH TEXAS, By and | § | |
| Through its Board of Regents, | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

COMES NOW Plaintiff,  Justin Trudeau, (hereinafter "Plaintiff" or "Dr. Trudeau"), and for his Original Complaint against the University of North Texas, By and Through its Board of Regents (hereinafter "UNT"), alleges and states:

*Parties*

1.01    Plaintiff is a citizen of the United States and, as a resident of Denton County, the State of Texas.

1.02    Defendant UNIVERSITY OF NORTH TEXAS ("UNT") is an institution of higher education created under the laws of the State of Texas. UNT's principal campus is located in Denton, Denton County, Texas, within this judicial district. UNT contracts and acts through its Board of Regents and its duly appointed administrators.

1.03    Service may also be made upon Texas Attorney General KEN PAXTON.

***Jurisdiction and Venue***

2.     The court has original jurisdiction under Title IX Education Amendment of 1972, 20 U.S.C §§1681-1688, and 42 U.S.C. § 1983.

3.     Venue is proper in this judicial district under 28 U.S.C § 1391(b).

4.     The Court also has supplemental jurisdiction under 28 U.S.C. §1367(a).

***Conditions Precedent***

5.     Plaintiff has exhausted all his administrative remedies. All conditions precedent to his right to file this action have occurred.

***Factual Background***

6.01     At all times material, Plaintiff was a tenured professor at the University of North Texas. He began his employement with UNT in 2005. He was initially hired to teach in the performance studies area in the department of communication studies.  He became a tenured professor in or around May 2012. He has a doctorate degree in philosophy ("PhD") in Communication Studies. Since he has been employed at UNT, Plaintiff had taught the following classes:

> Graduate:  Performative Writing, Postwar Performance Culture and the U.S. American Avant-Garde, Performance Theory, Performance Art, Performance Methods, Adaptation & Staging.

> Undergraduate: Performance Theory, Performance Art, Performance Methods, Rhetoric of Performance, Adaptation and Staging, Performance Composition, Introduction to Performing Literature (Supervised Three Teaching Assistants in charge of 75+ students).

6.02    In or around, December 2017, Plaintiff was first made aware of certain "claims" relating to a UNT graduate class, <u>Seminar in Adaptation and Staging</u>,  he taught in in the **2017 Fall academic semester**. The course at issue was for post-graduate students. It was offered through the College of Liberal Arts and Social Sciences, Communications Studies. All students received "A's" in the course.

6.03    A book assigned by Plaintiff to his students for the 2017 Fall academic year was entitled *A Director Prepares,* by Ann Bogart. Chapter Three of this book***1*** refers to "eroticism," which is a metaphor used by the author to describe approaches to directing actors.  The content and theme of each project were picked by the students.  The content or theme can indeed be read as sensual, erotic, or sexual.  And that this in turn required Plaintiff to talk about these subjects in his role as a teacher, and evaluator or facilitator after the performances were finished.

6.04    After the course was completed, he learned from the class evaluations ("SPOT") of the claims, generally, by students in his class.   He immediately brought the "claims" to the Chair of the UNT's Department of Communication Studies ("Chair").  Additionally,  on or about January 11, 2018, after the class had concluded,  he was first made aware of an official Office of Equal Opportunity ("OEO") investigation by way of notification of a complaint email from a UNT investigator, Ms. Christina Brodie, Assistant Director of Equal Opportunity, Institutional Equity and Diversity.  As per the OEO process identified by UNT, Plaintiff met with Ms. Brodie on or about

---

1 Specifically, *A Director Prepares* is described as "a thought-provoking examination of the challenges of making theatre. In it, Anne Bogart speaks candidly and with wisdom of the courage required to create 'art with great presence'. Each chapter tackles one of the seven major areas Bogart has identified as both potential partner and potential obstacle to art-making. They are Violence;

- 3 -

January 18, 2018. Plaintiff also provided a written response on January 25, 2018 defending himself.

      6.05    The allegations, generally, in the were as follows:

i.      During class, Plaintiff commented after a certain performance by students that the performances were "hot" and "erotic;"

ii.     Plaintiff made a "sexual comment" in reference to Student 3 and provided her with "sexualized feedback during a performance;"

iii.    Plaintiff offered Student 2 an "A" in the class "if she convinced other students to perform in a sexual manner on stage, and questioned the pregnancy status of other students in the class;"

iv.    Plaintiff referenced Student 2's breasts;

v.     Plaintiff commented about Student 1's performance attire; and

vi.    Plaintiff referred to Student 2 "as a psychopath," when he allegedly had prior knowledge of the student's mental health condition. This alleged comment also made other students "uncomfortable."

UNT claimed that the above allegations, i.-v., violated its Sexual Harassments policies and allegation vi. violated its policy relating to Non-Discrimination/Employment Opportunity, Affirmative Action, Non Retaliation.

      6.06    UNT determined that allegations 1, 2, 3 and 6 above contained "sufficient evidence to substantiate UNT violations. However, UNT also concluded that there was "insufficient evidence" to substantiate allegations 4 and 5.  UNT also concluded that the sustained allegations or comments because they:

---

Memory; Terror; Eroticism; Stereotype; Embarrassment; and Resistance. Each one can be used to generate extraordinary creative energy, if we know how to use it.

were unwelcome because they embarrassed the students, and caused them to be quiet in class, they were unrelated to the course materials, substantially interfered with the students' academic performance because they rarely participated in class discussions and performances as they were scared of what inappropriate comment or statement of a sexual nature that Plaintiff would say to them individually or collectively2.

Further, UNT also claimed that Plaintiff allegedly created an "intimidating and offensive educational environment for [his] students."

6.07    On or about January 18, 2018, Plaintiff responded to the allegations and was provided UNT policies and procedures relating to an OEO investigation. In a June 15, 2018 email, Ms. Brodie informed Plaintiff that "There is no appeals process for an OEO investigation."  This was in direct contradiction to UNT Policy 16.006 (Information and Procedural Guidelines for Pursuing and Resolving a Complaint of Discrimination, Including Sexual Harassment) which stated, in part, that "Faculty may appeal findings and/or sanctions to the University Review Committee."

6.08    In an email from the director of the OEO office on August 24, 2018, Eve Bell stated that "UNT Policy 16.006, while still available in the UNT Policy Manual, is no longer in use by the University.  As you will note, the now-defunct version of 16.006 that is published in the Manual states that appeals will be governed by Policy 15.1.4, which no longer exists.  I fully recognize how frustrating it is to rely on a University policy and be told that it is inoperative; however, that is the case in this instance.  Your concerns regarding OEO's failure to notify you of this fact have been noted."  Plaintiff had never received any notice that 16.006 was no longer used prior to this time, and UNT still continued to rely on and use 16.006.

---

2 None of this was included in the original complaint letter and the students' comments in the SPOT evaluation directly contradicts the veracity of these claims.  Mostly, the students complained that they had to participate too much, and this was especially true in regard to performances.

6.09     In UNT policy 16.006, II.G, it also stated that "It is incumbent upon the investigation official to document a reasonable justification for extending an investigation beyond 45 days."  In her May 30th, 2018 investigative report Ms. Brodie wrote that on December 21, 2017 her office was first made aware of the complaint involving Plaintiff.  In total, the investigation took five (5) months rather than the standard 45 days.  Further, Plaintiff was provided an official justification several months after the initial charges and only after he reminded the OEO office. In an email in which Plaintiff  had to initiate on June 28, 2018, Plaintiff wrote to Ms. Brodie: "In UNT policy 16.006 (II.G) it states that 'It is incumbent upon the investigating official to document a reasonable justification for extending an investigation beyond 45 working days.'  Will this be supplied to me?"

6.10     Ms. Brodie wrote Plaintiff back the same day that "to address your concern with the 45 days' timeline of our investigation. Often times investigations will go over 45 days for various reasons. However, there was a significant amount of information to review in your investigation; therefore I wanted to make sure that I throughly (sic) reviewed all the information and interviews prior to the completion of the investigation. I do apologize for the delay; however as stated above I wanted to throughly (sic) review all information that was provided to our office."

6.11     When brought to the attention of the director of the OEO the director Eve Bell wrote in an email that: "Because OEO does not operate under the procedures outlined in 16.006, Ms. Brodie was not required to provide you with a "reasonable justification" for extending the investigation beyond 45 days.  However, you noted that she did provide you with an explanation for the delay (i.e., that there was a substantial amount of evidence available that needed to be analyzed before OEO could reach a finding).  Allow me to reiterate and elaborate upon Ms. Brodie's

explanation.  This investigation required multiple interviews of students and faculty, the information from which had to be synthesized in order to reach a determination.   Additionally, OEO's investigators have carried a particularly heavy case load this year due to increased reporting of alleged discrimination and harassment from students, faculty and staff.  Please allow this to serve as your "official justification."

6.12    Despite having five months to work on Plaintiff's "case," Ms. Brodie did not "thoroughly" investigate the evidence Plaintiff presented to her from the beginning, and had violated his right to a speedy investigation as well as due process.

6.13    Plaintiff was instructed by UNT that he would be provided two (2) main opportunities to defend himself in the OEO investigation, once in person when the allegations "are laid out to you and once in writing."  Both in person and in writing, Plaintiff presented evidence in regard to what went wrong in the class in the hopes that the veracity of the claims made against him would be investigated.

6.14    In UNT policy number 06.025 (Faculty Misconduct and Discipline), it stated under Administrative Procedures that "The faculty member has the right to present evidence on his or her behalf and may seek advice and assistance from a faculty advocate."  Further, in UNT policy 16.006 VI,  it stated that "In cases of determination that an accuser has made claims falsely and maliciously, sanctions may be imposed."   In UNT policy 16.004 (Nondiscrimination/Equal Opportunity, and Non-Retaliation) (VII), it stated under false complaints that "An individual who knowingly makes a false complaint or who provides false information during an investigation conducted under this policy is subject to disciplinary action, including expulsion, termination of employment, or

termination of business relationships with the University."

6.15    In his meeting on January 18, 2018 with Ms. Brodie, and later in writing in his letter of January 25, 2018, Plaintiff presented Ms. Brodie evidence concerning the allegations.  Since Plaintiff was not told who his actual accusers were at this time, Plaintiff presented her with the names of all members of the class as a list of <u>potential witnesses</u>.  Plaintiff also presented her with his SPOT evaluation from the course in which one of the student's reported that he had "discussions about the personal sex lives of students."  Plaintiff denied this allegation and stated it was an absolutely false claim and <u>this was never addressed in the official complaint at all</u>.

6.16    In addition to the students' names and his SPOT evaluation by the students, Plaintiff presented Ms. Brodie a disturbing occurrence that occurred at the beginning of the course at issue so  that she could investigate it.  Plaintiff relayed to Ms. Brodie that after the very first class-meeting, a student informed Plaintiff that one of the other student's in the class had made inflammatory and demonstratively negative comments about him at a local bar. At this time,  Plaintiff had been teaching at UNT since 2005, and a graduate student reporting another graduate student's malicious behavior towards him had never occurred.

6.17    Ms. Brodie failed to examine the evidence Plaintiff presented to her by her own admission.  In an email to Plaintiff on June 15, 2018 she wrote to Plaintiff that "Dean Cobb informed me that you inquired about the anonymous comment on your SPOT evaluation alleging that you engaged in conversation with students about their personal sex lives. This comment was not raised as an allegation in this investigation.  The notice of complaint I provided you on January 18, 2018 captured the allegations my office investigated. I was also informed that you inquired about students

making concerning comments about you. We discussed this issue in our January 18 meeting. At that time, I informed you that you could file a separate complaint with OEO if you believed those comments pertained to your protected status, but you declined to do so."

6.18    In a June 28, 2018 email, Plaintiff responded: "Thank you for getting back to me.  In your response you write that 'We discussed this issue in our January 18 meeting. At that time, I informed you that you could file a separate complaint with OEO if you believed those comments pertained to your protected status, but you declined to do so.'  This is not my recollection of this meeting and I would not have mentioned the instance in my letter on January 25th if I believed you were not investigating the evidence I presented to you both orally and in writing.  I would very much like this to be investigated and would like to know how to proceed and whether or not there is a statute of limitations in regard to this matter."

6.19    On or about June 28, 2018, Ms. Brodie responded back "As I stated in our meeting on January 18, 2018 you may file complaint with our office regarding the concerning comments you believe students made about you. I will have our administrative assistant Rebbecca Dobrin send you an inquiry form to fill out and return to our office. Additionally, please provide OEO with any information that pertains to your concerns. I have cc'd Rebbecca on this email."

6.20    Rather than exploring the evidence the Plaintiff presented to her during the five-months in which she was investigating his case, Ms. Brodie suggested that he should file a new formal complaint about his student.  The inquiry form in which the Plaintiff was sent was in regard to UNT's non-discrimination policy and is not relevant to a "protected status."  From the very first meeting with the Plaintiff, Ms. Brodie had made it a point to want to only investigate issues relating

to protected statuses and not what went wrong with classroom assignments, and the effect it had on classroom culture. In sum, Ms. Brodie admitted that none of the concerns and evidence that the Plaintiff had presented to her were investigated at all—to at least assist in investigation the allegations—and Plaintiff has been denied due process as a result.

6.21    In addition to the outrageous length of the OEO process and its lack of due process, Plaintiff's right to confidentiality had been violated.  In UNT policy 16.006 II.E. it states that "All individuals who are involved in the complaint reporting, mediation and/or investigation process are obligated to maintain confidentiality of the proceedings in accordance with law.  All who take part in any of the procedures under this policy will be expected not to reveal any information that they learn in the course of these proceedings unless disclosure is required by law."  This policy was not identified as being deleted on the UNT until January 3, 2019 on the UNT policy web-site,  well after the investigation was concluded.

6.22    In the meeting on July 10, 2018 with the Chair of his department, it was confirmed to Plaintiff that his fears of disclosure about his case were founded. The chair stated that all of the faculty members in the Department of Communication Studies knew about the allegations, and that many had been talking about it openly without Plaintiff's consent, knowledge or his ability to defend himself as he was told explicitly not to talk about the investigation.

6.23    The Chair further told Plaintiff that he had consulted with a junior faculty member recently about what potential punishments should be imposed, despite never even hearing from the Plaintiff in the form of an oral defense or in writing as required by UNT policy number 06.025.  The chair reported that he went to the junior colleague because he was "just another straight white male"

like the Plaintiff.  This is also in violation of UNT policy 16.004V, which states that "Individuals who report suspected discrimination or harassment, or who participate in a related investigation should not discuss the complaint or investigation during the resolution process."

6.24    In a letter dated July 5, 2018, the Chair of the department laid out his punishments without any response or input from the Plaintiff or allowed him to respond orally or in writing, a clear violation of UNT policy 06.025.  The dean's office had to admonish the Chair to "pull" the letter, and it's clear that the Chair himself was not aware of University procedures and policies. Plaintiff was then instructed by an Associate Dean to "pretend the letter doesn't exist."

6.25    In addition to injurious chatter in the department, Plaintiff has been impacted financially by these allegations and the lack of advocacy on his behalf.  Despite an ongoing investigation, Plaintiff was obligated to provide the department's personal affairs committee the SPOT evaluation teaching score of this class (.8/5) as part of his annual merit evaluation.  It is, by far, the most outrageous score he has received in his 22 years of teaching, and it also contained malicious and unproven claims about his teaching and character.  Evaluation scores were and are used by UNT for merit evaluations and pay increases and career advancement at UNT and other universities, all to the actual detriment and damage to Plaintiff. Further, given the amount of time Plaintiff had to dedicate to defend himself for almost two (2) years, he could not conduct research, publish articles and direct shows, which singularly and cumulatively negatively affects his merit and pay.

6.26    UNT had also "blacked-out" certain passages within the SPOT evaluation because the investigation was ongoing and members of the Personal Affairs Committed ("PAC") were able to

read the document with the redactions to pass judgment on his teaching abilities.  The document itself looks highly unusual and inflammatory and its inclusion no doubt hurt Plaintiff's overall teaching score.

6.27    In addition to this SPOT evaluation, Plaintiff has already lost a graduate student who has asked that another faculty member to be his chair after he heard about the allegations.  This too damaged Plaintiff's teaching score and also impacted him financially by way of merit allocation, as well has the removal of class for him to teach. These negative impacts occurred, and continue even today, while the investigation was ongoing and Plaintiff had no means to defend himself to the department or to the Chair of the department who acted in his dual role as chair and "complainant." To date, no other graduate student has asked the Plaintiff to serve as a major advisor, which further impacted the Plaintiff's teaching score.

6.28    The original complaint letter that was provided to Plaintiff on January 18, 2018, and that of the decision letter on May 30, 2018, had significantly changed. Further, Plaintiff was not afforded the opportunity to address these changes over the course of the investigation.  The charges outlines in the original letter given to the Plaintiff were worded materially differently than the ones given to the Dean and chair, and still different in the decision letter.  In other instances, specific dates listed in the original complaint letter have mysteriously disappeared after the Plaintiff pointed out that the class did not even meet that day.  The allegations actually changed in some instances. As an example only, in one charge the wording changed significantly three (3) times, and Plaintiff was never afforded an opportunity to address or otherwise defend himself with the new allegations. Nowhere was this truer than in the "substantiated" sixth claim that was never presented to the

Plaintiff, either orally or in writing, during the entire investigative process.

6.29     In her decision letter, Ms. Brodie wrote that the "OEO established that Dr. Trudeau was aware that Student 2 had a bipolar disorder when he called Student 2 a psychopath during a class discussion."  When the Plaintiff brought to the attention of the OEO director, Eve Bell, the absence in the original charge she responded:  "Additionally, the statements of fact made in the report (e.g., your awareness of a student's bipolar disorder) are supported by the record in this case."

6.30     This claim was false, and Plaintiff was never told or asked whether or not if he knew that one of the student's leading the complaints against him was by a  student who was allegedly bi-polar. <u>Not until the final decision letter did this allegation appear</u>. If Plaintiff would have known that a student in his class was bi-polar he would have immediately brought it to the attention of the investigator.  He was never provided a letter from the Office of Disability Access ("ODA") or from any of the students regarding such an alleged condition, i.e., the alleged disability was never  brought to his attention by a student or administration, nor was an "accommodation" ever sought.   Further, the  Plaintiff  was never any provided a writing or supplied with the "record" reported by the OEO director.

6.31     After a decision letter dated May 30, 2018, Plaintiff continued to attempt to resolve the matter by various "appeals" or other UNT processes relating to the penalties,  as he was told that he could not appeal the determination or findings of the allegations.  In the end, Plaintiff was found to have violated UNT Policy 16.005 (Sexual Harassment) and 16.004 (Harassment on the basis of disability) and was punished by implementation of the following sanctions: no merit raise and ineligibility for summer teaching.

6.32     During the "appeals" process of the punishments, after the May 30, 2018 letter, the

Plaintiff was told that he could "skip" his appeal to the college and go straight to the University

Grievance Committee ("UGC") to contest the entire matter, including the findings and punishments.

 The Plaintiff was also instructed to do this because the college level grievance committee did not

have the power to overturn the decision, but that the UGC did.

6.33     In reliance on the advice given to him by a UNT administrator, Plaintiff appealed to

the UGC. But after the appeal was well in the process, the Plaintiff was told that the UGC, also,

could not overturn the decision and it could only weigh in on the punishments given by the Chair

and the Dean of the College.   In effect, the Plaintiff was denied an important step in the appeals

process by not appealing to the college appeals first and then the UGC.

6.34     On or about November 27, 2018, Plaintiff was provided the decision of the UGC. The

UGC stated the following:

> Given this general sense that the events reported in this class were singular events,
> not a pattern of misconduct, the Committee supported the OEO recommendation of
> completion of Sexual Harassment training.  However, given the general support of
> Dr. Trudeau in the role as faculty instructor and the fact that this was a first time
> case, the Committee suggests that given the **onerous financial penalty** (emphasis
> added) of the denial of summer teaching in 2019, a more appropriate sanction would
> be to **penalize the appellant for his conduct with regard to his merit assessment**
> (emphasis added).  The committee also notes that the appellant already received no
> merit pay in 2018-19 due to his low teaching scores for the **Fall 2017 performance
> course that is the subject of this grievance**. **The committee views an effective
> penalty of two years without merit pay as a very significant financial penalty**
> (emphasis added). The Committee, in a majority vote [7 of 10 members present],
> recommends the denial of summer teaching sanction be withdrawn.  The three
> members who opposed this recommendation voted to uphold both penalties imposed
> by the chair and dean.

6.35    In effect, the committee determined that the Plaintiff had been penalized for two (2) merit cycles, which were beyond the measure of the stated punishment, even though the allegations were "not a pattern of misconduct," nor could they be considered to be in violation of UNT policies, including sexual harassment which requires "severe, persistent, or pervasive" actions of Plaintiff which interfered with the complaining student's ability to participate in or benefit from the class. All students received "A's" for their efforts in the class and not once did any student inform Plaintiff about any issues or problems in the class.   The allegations made against Plaintiff were baseless and did not violate the university's policies or federal law as the "allegations" were not "severe, persistent, or pervasive," the definition used by UNT, to have interfered with the complaining students' ability to participate in or benefit from the class. In fact, as just one example, it was determined that two of the allegations were unsubstantiated. This fact further demonstrated the animus that existed within the class.

6.36    The "investigation" was predetermined, improper and deficient. Additionally, Plaintiff was not provided the "evidence" against him as required by UNT policies in order to allow him to properly respond or otherwise defend himself.  Finally, even assuming the allegations had merit, which they did not, at no time while employed by UNT had Plaintiff received any of the required training pursuant to UNT policies, and for which the "punishment" was based, at least in part.

6.37    For the appeals process, Plaintiff was essentially required to appeal to the person (the "Chair") who made, managed or directed the charges against him. The Plaintiff was told by the Chair that he informed the Dean that the Chair should not have been required to be the

"complainant" against one of his own faculty members, and that the Dean himself should have assumed this role. This conflict—that is, the Chair also served as the ultimate authority in the department on the issue of who gets what with regards to merit pay every year—was brought to the attention of UNT, via the Dean.

## COUNT ONE
### (Retaliation Under Title IX)

7.      Plaintiff incorporates by reference all previous paragraphs.

8.      UNT is a state supported institution. UNT receives federal funds directly and indirectly and is thus subject to the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 (the "Act"). Section 1681 of the Act states in relevant part the following:

(a) Prohibition against discrimination; exceptions,

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

9.      34 CFR § 106.71 provides:

 "The procedural provisions applicable to title VI of the Civil Rights Act of 1964 are hereby adopted and incorporated herein by reference [into a claim under Title IX]. These procedures may be found at 34 CFR 100.6-100.11 and 34 CFR, part 101." The Civil Rights procedures provide in pertinent part:

(e) *Intimidatory or retaliatory acts prohibited.* No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part. The identity of complainants shall be kept confidential except to the extent necessary to carry out the purposes of this part, including the conduct of any investigation, hearing, or judicial proceeding arising thereunder.
34 CFR § 100.7(e); *accord Cannon v. University of Chicago*, 441 U.S. 667, 715-717

(1979) (stating that Title IX regulations incorporate the requirement in the Title VI regulations).

10.     Justin Trudeau, Plaintiff, is a person who has been retaliated against because he "testified, assisted, and participated in any manner in an investigation, proceeding and hearing" involving the allegations made against him of violations of UNT's sexual harassment policies. He was then determined to be at fault and suffered monetary damages, including, but not limited to, merit pay, prestigious committee assignments in which the faculty most be voted onto via election, and the ability to work as a graduate advisor to post-grad students, and the removal of one (1) summer class.

11.     Plaintiff was wrongly accused. He defended himself. Even if Dr. Trudeau was not personally the victim of discrimination, he is still entitled to sue if he has been retaliated against for participating and providing evidence in an investigation of a sexual harassment claim.

12.     Plaintiff did so participate and has been retaliated against. UNT had enacted reasonable, fair rules setting appropriate limits regarding the conduct of teachers, students, and employees in interacting with one another. UNT chose to enact policies regarding sexual harassment and consensual conduct. All teachers, students, and employees were on fair notice of these rules and of their obligation to abide by them. However, UNT picked and chose the policies it desired, and simply  ignored others.

13.     As a result Dr. Trudeau has been damaged by Defendant's unlawful acts.

**COUNT TWO**
**(Violation of Due Process Under the United States Constitution)**

14.     Plaintiff incorporates by reference all previous paragraphs.

- 17 -

15.     UNT's actions violated both Plaintiff's and substantive or procedural due process rights. As the result of UNT's actions and omissions, Plaintiff was substantially damaged.

16.     At all times relevant herein, UNT was acting and continues to act under color of state law pursuant to 42 U.S.C. 1983.

17.     The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

18.     The Due Process Clauses of the United States Constitution apply to higher education investigation procedures and disciplinary decisions, including sexual harassment investigations that have the potential to result in loss of reputation, employment or status.

19.     UNT owes Dr. Trudeau a duty to comply with the United States Constitution and the liberties provided therein. This includes the rights to due process, free speech, and equal protection.

20.     As a tenured professor at the UNT, Dr. Trudeau is entitled to procedural due process with respect to any adverse employment decision.

21.     As the subject of a sexual harassment investigation process, Dr. Trudeau was entitled to have adequate notice of charges affecting his reputation and livelihood under the Constitution of the United States, and to be heard in a meaningful manner in the course of the investigation. Dr. Trudeau is also entitled to be free from retaliation based on his participation in the investigation.

22.     Within the constitutional framework, UNT has an obligation to provide a fundamentally fair and reliable investigation process, which is both prompt and remedial when affecting Dr. Trudeau's liberty and property interests, and that fundamentally fair and reliable investigation process must meet constitutional due process requirements which include a right to

representation by an attorney and a right to cross-examine all, including adverse witnesses.

23.    The investigation should also be conducted in a confidential manner so as to avoid unfair public knowledge of baseless claims and repercussions, as evidenced in this case. UNT did not maintain confidentiality, did not insist upon confidentiality and took no precautions to prevent disclosure of information during the course of the investigation which would be and was damaging to Dr. Trudeau even if he had been fully exonerated through a proper and prompt investigation.

24.    The poor investigation, followed by subsequent committees' uncritical analysis has so tainted the outcome that Dr. Trudeau can in no way afford himself of the protections contemplated in the due process clause of the Fourteenth Amendment to the United States Constitution.

25.    Through policies - many of which were changed in the middle of the investigation, Dr. Trudeau has a constitutionally protected property interest in his employment by UNT.

26.    UNT has failed to provide any of these procedural and substantive due process requirements to Dr. Trudeau in the course of the investigation, and will continue to provide and apply procedural and substantive due process requirements in the future.

27.    In breach of its duties, UNT, through its authorized agents and employees, violated and will continue to violate Dr. Trudeau's rights to due process, free speech, and equal protection as set forth in the above allegations.

28.    As a direct and proximate result of the violation by UNT of the due process clause of the Fourteenth Amendment to the United States Constitution, Dr. Trudeau has already been deprived of the rights and privileges associated with his property interest and tenure, namely the loss of significant income associated with projects and academic leadership positions ancillary to his

position as a tenured UNT professor.

29.     As a direct and proximate result of the University's violation of his constitutional rights, Dr. Trudeau has suffered and will continue to suffer economic and financial losses, including but not limited to the raises and ancillary income of over $50,000.00 he obtained from his other projects, his professional reputation, and his position within UNT's College of Liberal Arts and Social Sciences, Communications Studies, and the academic community and faculty of UNT.

## COUNT THREE
### (Violation of First Amendment)

30.     Plaintiff incorporates by reference all previous paragraphs.

31.     Plaintiff suffered an adverse employment decision. Also, the Plaintiff's speech involved a matter of public concern, in that it served an academic purpose and was related to the subject matter of the course at issue during the 2017 Fall academic year. The Plaintiff's interest in commenting on matters of public concern outweighed UNT's interest in promoting efficiency, and was expressly consented to by UNT.  Finally, the Plaintiff's speech motivated the UNT's actions.

32.     As the result of UNT's actions and omissions, Plaintiff was substantially damaged.

## COUNT FOUR
### (Violation of Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution Pursuant to 42 U.S.C. §1983)

33.     Plaintiff incorporates by reference all previous paragraphs.

34.     The Fourteenth Amendment to the United States Constitution prohibits race and gender discrimination. As evidenced by the facts and exhibits detailed above, gender discrimination improperly caused UNT and its employees to unlawfully find Dr. Trudeau responsible for engaging

in sexual harassment.

35.     Upon information and belief, female UNT employees suffer no historical disadvantage regarding sexual misconduct allegations which would allow UNT and its employees to validly discriminate against male employees like Dr. Trudeau.

36.     Dr. Trudeau brings these claims pursuant to 42 U.S.C. § 1983 because the actions of UNT and its employees were taken by said defendants under color of state law.

37.     Because of these violations, Dr. Trudeau has suffered, among other things, considerable emotional distress, loss of present and future earnings, humiliation, and damage to his reputation.

## COUNT FIVE
### (Breach of Contract by UNT)

38.     Plaintiff incorporates by reference all previous paragraphs.

39.     The relationship between Plaintiff and UNT was, in part, contractual in nature.

40.     Dr. Trudeau is a party to a valid and enforceable contract of employment with UNT.

41.     The contract was wrongfully breached by UNT.

42.     Dr. Trudeau suffered and will continue to suffer losses and damages as a result of the breach of contract, including but not limited to loss of earnings, diminished earning capacity, lost career opportunities, loss of reputation, humiliation, embarrassment, mental and emotional anguish.

43.     UNT's breach caused injury to Plaintiff and resulted in damages.

44.     Unless remedied by preliminary and permanent injunctive relief, Plaintiff will continue to be irreparably injured in his reputation.

## ATTORNEY'S FEES

45.     Because of the UNT's actions, it was necessary to secure the services of the

undersigned attorneys to enforce and protect the rights of Plaintiff. Defendant should be ordered

to pay reasonable and necessary attorney's fees as follows:

(a)     for the preparation and trial of this lawsuit, an amount not less than $75,00.00;

(b)     for post-trial, pre-appeal services, an amount not less than $7,500.00; and

(c)     in the event of appeal from the judgment of this Court to the Court of Appeals, an amount not less than $25,000.00; and

(d)     in the event that an Application is made to the Supreme Court, an amount not less than $20,000.00.

## JURY DEMAND

46.     Dr. Trudeau demands a trial by jury.

## PRAYER

Dr. Trudeau prays for judgment against UNT as follows:

1.      Declare that UNT's actions in depriving Dr. Trudeau of his constitutionally protected

property interest in continued employment absent a lawful, unbiased investigation by a neutral third

party, and later, if appropriate, a lawful pre-termination hearing, that the present procedure used is

unlawful and violative of the rights of Dr. Trudeau under the Due Process Clause of the Fourteenth

Amendment;

2.      If an investigation is warranted, that said investigation be conducted by a neutral third

party unaffiliated with UNT and order that all activities, investigation, interviews and other action be

deemed confidential and proprietary until the investigation is concluded in order to protect all

participants from public scorn and harm.

3.     Order UNT to remove all materials from Dr. Trudeau's personnel file, including the negative SPOT evaluations, that were placed in the file without the provision to Dr. Trudeau of due process, including the opportunity to present witnesses, cross-examine his accusers, and be assisted by legal counsel.

4.     An award to Dr. Trudeau of compensatory damages for lost earnings, future earnings, and reimbursement of any lost benefits in an amount in excess of One Hundred Thousand Dollars ($100,000.00);

5.      An award to Dr. Trudeau of compensatory damages sufficient to compensate him for mental anguish and emotional distress, embarrassment and humiliation, and damage to his professional reputation as a result of UNT's actions, in an amount in excess of $100,000.00, and other damages in an amount to be determined at trial, in excess of $100,000.0, as well as prejudgment and post-judgment interest.

6.     An award to Dr. Trudeau of the costs and disbursements of this action, including reasonable attorney fees.

7.     An award to Dr. Trudeau of such other and additional legal and/or equitable relief to which he may be entitled.

8.     That Trudeau have and recover judgment against UNT under Title IX for its willful, intentional, deliberate, reckless conduct in retaliating against Trudeau for his lawful participation as a witness in an investigation of an alleged sexual harassment claim.

9.     That Trudeau have such other and further relief to which he may be justly entitled at law or in equity.

- 23 -

THE LAW OFFICE OF MICHAEL P. KELLY

By:  **/s/ Michael P. Kelly**
Michael P. Kelly
Texas Bar No. 11227280

P.O. Box 150589
Dallas, TX 75315
Telephone:  (214) 821-7255
Facsimile:  (214) 821-7251
E-Mail:  mptkelly@sbcglobal.net

**Attorney for Plaintiff**