IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

SHERMAN DIVISION

| | | |
|---|---|---|
| JUSTIN TRUDEAU, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Civil Action No. 4:19-cv-00723 |
| | § | |
| UNIVERSITY OF NORTH TEXAS, By and | § | |
| Through its Board of Regents, et. al., | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S  MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPAINT AND BRIEF IN SUPPORT**

COMES NOW Plaintiff, Justin Trudeau, and asks the Court to deny Defendant's Motion to

Dismiss [Document No. 24], or, in the alternative, Plaintiff asks the Court for leave to replead, or in

the alternative allow limited discovery.

## Introduction

Plaintiff, Dr. Justin Trudeau, an employee and  tenured professor at the University of North

Texas ("UNT") alleges four (4) claims: (1) Violation of Title IX; (2) Violations of Due Process

under the United States Constitution; (3) Violation of First Amendment; and (4) Violation of Equal

Protection Clause of the Fourteenth Amendment. [Document 18].  **See current lawsuit.**

Dr. Trudeau's post-graduate students made specific charges of sexual harassment alleged to

have occurred during class in the 2017 Fall Semester session.  Plaintiff is alleged to have engaged in

sexual harassment for certain comments he made during class while teaching.  Unbeknownst to

Plaintiff, UNT initiated a Title IX investigation of Plaintiff in or around October 2017, and

concluded the investigation, initially, sometime around December 2017 to January 2018 after the

class had finished. However, the Title IX process continued with new charges and finally concluded

on or about November 27, 2018.   Plaintiff filed his original complaint on October 4, 2019

[Document 1].

**Alleged Facts Supported by the Amended Complaint**

Plaintiff's amended complaint is included here in relevant part for ease of examination:

> Plaintiff became a tenured professor in or around May 2012. He has a doctorate degree in Philosophy ("PhD") in Communication Studies. Since he has been employed at UNT, Plaintiff had taught the following classes:
>> Graduate:  Performative Writing, Postwar Performance Culture and the U.S. American Avant-Garde, Performance Theory, Performance Art, Performance Methods, Adaptation & Staging.

¶ 6.01 Plaintiff's First Amended Complaint ("Complaint").

In the Fall 2017 academic year, Plaintiff was teaching a class entitled <u>Seminar in Adaptation and Staging</u>. He had been teaching this same class for many years. The course at issue was for post-graduate students. It was offered through the College of Liberal Arts and Social Sciences, Communications Studies. At the end of this particular class, all students received "A's" in the course. ¶ 6.02 Complaint. The class dealt with eroticism which described approaches to directing actors. The content and theme of each project were picked by the students, to include the selection of clothing as they performed a certain scene or act. The actual content or theme can indeed be read as sensual, erotic, or sexual, and has been over the many years he has taught.  And this in turn required Plaintiff to talk about these subjects in his role as a teacher, and evaluator or facilitator, after the performances were finished. ¶ 6.03 Complaint.

After the course was completed in December 2017, but not until on or about January 11, 2018, Plaintiff was first made aware of an official Office of Equal Opportunity ("OEO") investigation by way of notification of a complaint letter emailed from a UNT investigator, Ms. Christina Brodie, Assistant Director of Equal Opportunity, Institutional Equity and Diversity. ¶6.04 Complaint. Defendant Brodie's letter stated that the OEO "has initiated an investigation into allegations of sexual harassment in violation of University policy 16.005 (Sexual Harassment)."

On or about January 18, 2018, Defendant Brodie provided the relevant allegations against Plaintiff.  The allegations **initially** were as follows:

i.    During class, Plaintiff commented after a certain performance by students that the performances were "hot" and "erotic;"

ii.   [During class], Plaintiff made a "sexual comment" in reference to Student 3 and provided herwith "sexualized feedback during a performance;"

iii.  [During class], Plaintiff offered Student 2 an "A" in the class "if she convinced other students to perform in a sexual manner on stage, and questioned the pregnancy status of other students in the class;"

iv.   *Plaintiff referenced Student 2's breasts;*

v.    *Plaintiff commented about Student 1's performance attire; and*

vi.   Plaintiff referred to Student 2 "as a psychopath," when he allegedly had

prior knowledge of the student's mental health condition. This alleged comment also made other students "uncomfortable."
¶ 6.05 Complaint.

Investigators Eve Bell and Christina Brodie determined that allegations (i), (ii), (iii) and (vi) above contained "sufficient evidence to substantiate UNT violations. However, they also concluded that there was "insufficient evidence" to substantiate allegations *iv) and (v)*. Defendants Bell and Brodie sustained the allegations or comments since they:

were unwelcome because they embarrassed the students, and caused them to be quiet in class, they were unrelated to the course materials, substantially interfered with the students' academic performance because they rarely participated in class discussions and performances as they were scared of what inappropriate comment or statement of a sexual nature that Plaintiff would say to them individually or collectively.

Further, Defendants claimed that Plaintiff allegedly created an "intimidating and offensive educational environment for [his] students." ¶ 6.06 Complaint.

For the next approximately one and one-half (1 ½) years, Plaintiff attempted to defend himself, but was unable. He was met with multiple statements from Defendants during the "process" that the UNT grievance policies and procedures, then-identified and listed by UNT, were not applicable even though the same policies and procedures were still shown by UNT to apply. See e.g., ¶¶ 6.07-6.11, 6.13-6.14 Complaint. Defendants picked certain UNT policies and simply ignored others. Plaintiff repeatedly sought explanation and clarification about what the charges were, who made them, and how to proceed.

When it appeared that he finally grasped the proceeding, he was told something else and/or the allegations against him changed even though the class had concluded months before being told this. ¶ 6.28 Complaint. Defendants Brodie and Bell, despite having five (5) months to investigate the matter, did not "thoroughly" investigate the matter. ¶ 6.12 Complaint. For example, Plaintiff was never told who the accusers were, and that allegations somehow changed or morphed into other non-disclosed allegations. ¶¶ 6.15-6.16, 6.28, 6.30 Complaint. Further, the OEO officials, Defendants Broadie and Bell, refused to consider evidence Plaintiff presented to the OEO. ¶¶6.17 - 6.20 Complaint. Plaintiff also learned that the allegations against him were widely disclosed to numerous employees of UNT, including his peers and colleagues. ¶¶6.21-6.23 Complaint. This violated OEO and UNT policies and demonstrates the retaliatory conduct of Defendants because Plaintiff was attempting to defend himself.

To further demonstrate the retaliation, biases and prejudices against Plaintiff, in one of the decision letters , Defendant Brodie, with the knowledge and approval of Defendant Bell, wrote that the "OEO established that Dr. Trudeau was aware that Student 2 had a bipolar disorder when he called Student 2 a psychopath during a class discussion." When the Plaintiff brought to the attention of the OEO director, Eve Bell, that this chare was absent from the original charge she responded: "Additionally, the statements of fact made in the report (e.g., your awareness of a student's bipolar disorder) are supported by the record in this case." ¶ 6.29 Complaint.

On or about November 27, 2018, Plaintiff was provided the <u>final</u> decision of the UGC of UNT. The UGC stated the following:

Given this general sense that the events reported in this class were singular events, not a pattern of misconduct, the Committee supported the OEO recommendation of completion of Sexual Harassment training.  However, given the general support of Dr. Trudeau in the role as faculty instructor and the fact that this was a first time case, the Committee suggests that given the **onerous financial penalty** (emphasis added) of the denial of summer teaching in 2019, a more appropriate sanction would be to **penalize the appellant for his conduct with regard to his merit assessment.** (emphasis added).  The committee also notes that the appellant already received no merit pay in 2018-19 due to his low teaching scores for the **Fall 2017 performance course that is the subject of this grievance. The committee views an effective penalty of two years without merit pay as a very significant financial penalty.** (emphasis added). The Committee, in a majority vote [7 of 10 members present], recommends the denial of summer teaching sanction be withdrawn.  The three members who opposed this recommendation voted to uphold both penalties imposed by the chair and dean.  ¶ 6.34 Complaint.

## Standard of Review

Federal Rule of Civil Procedure 12(b)(1) requires dismissal of an action if the court lacks jurisdiction over the subject matter of the plaintiff's complaint. *Carter v. Livingston*, 2019 U.S. Dist. LEXIS 158359 (E.D. Tex., July 29, 2019);  FED. R. CIV. P. 12(b)(1). The Rule allows a party to challenge the subject-matter jurisdiction of a district court based on: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996). The party asserting the existence of jurisdiction bears the burden of proof once a court's subject-matter jurisdiction is challenged. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). Here, the Defendants is a facial attack and therefore the Court considers "just the sufficiency of "the allegations in the complaint because they are presumed as true.'" *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

The Supreme Court confirmed that "a state official in his or her official capacity, when sued for *injunctive relief*, would [still] be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Id.* 71 & n.10 (emphasis added)

(citing *Ex parte Young*, 209 U.S. 123, 159-160, 28 S. Ct. 441, 52 L. Ed. 714 (1908)) . Therefore, as further discussed below, Plaintiff's Section 1983 claims may proceed against the three employees in their official capacities for prospective injunctive relief and in their individual capacities for damages.

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." To defeat a Rule 12(b)(6) motion to dismiss, a plaintiff must "nudge[ ] their claims across the line from conceivable to plausible" by pleading "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). In other words, a plaintiff must establish "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).  In reviewing a Rule 12(b)(6) motion, the court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Sonnier v. State Farm Mutual Auto. Ins. Co*., 509 F.3d 673, 675 (5th Cir. 2007).  However, the court does not "strain to find inferences favorable to plaintiff" or "accept conclusory allegations, unwarranted deductions, or legal conclusions." *Southland Sec. Corp. INSpire Ins. Solutions, Inc*., 365 F.3d 353, 361 (5th Cir. 2004) (internal quotation marks and citations omitted).

Generally, courts should give plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case under Rule 12(b)(6). See *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co*., 313 F.3d 305, 329 (5th Cir. 2002). The court may deny leave to amend, however, if the defects are incurable or the plaintiffs have already alleged their best case. See *Id*; *Bazrowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir. 1998).

## STATEMENT OF THE ISSUES

1.     Whether Plaintiff's pleadings at this stage are sufficient. (pp. 6-29)

2.     Whether Title IX prohibits an alleged harasser from pursuing a claim. (pp. 6-12)

3.     Whether Plaintiff's Title IX allegations are sufficient at this stage. (pp. 6-12)

4.     Whether Plaintiff's classroom teachings are, in this case, protected. (pp. 12-21)

5.     Whether Plaintiff's constitutional claims are appropriate as plead. (pp. 21-28)

## <u>Argument</u>

### I.     Title IX.

Without reference to any authority, UNT argues that Plaintiff's Title IX claims are intrinsically barred because he was the "alleged" harasser and was found "guilty." Defendants do not offer any authority for the contention that a plaintiff—student or employee—is barred under Title IX from pursuing a claim because he was the alleged harasser, while he participated in a Title IX hearing and process, and was found guilty.  Furthermore, UNT argues that Plaintiff "pleads no facts that **plausibly raise** an inference that the sanction imposed by UNT was in retaliation for his participation in the investigation." (emphasis added).   Here, facts alleged demonstrate he was retaliated against for his participation in the investigation by UNT.  UNT also alleges that Title VII preempts Title IX claims. Plaintiff does not allege any Title VII claims. *See below*.

Courts look to the body of law developed under Title VI and Title VII to analyze sex discrimination cases under Title IX. *Pacheco v. St. Mary's Univ.*, 2017 U.S. Dist. LEXIS 94510, 2017 WL 2670758, @39.  Also, see *e.g. Canutillo Indep. Sch. Dist. v. Leija*, 101 F.3d 393, 404 (5th Cir. 1996) ("In reviewing claims of sexual discrimination brought under Title IX, whether by students or employees, courts have generally adopted the same legal standards that are applied to such claims under Title VII."); see also *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994)

("Because the statutes share the same goals and because Title IX mirrors the substantive provisions of Title VI of the Civil Rights Act of 1964, courts have interpreted Title IX by also looking to the body of law developed under Title VI, as well as the caselaw interpreting Title VII.") (internal citations omitted).

Generally, private contests to disciplinary proceedings under Title IX manifest themselves as one of four broad theories. Plaintiff only asserts: (1) plaintiffs claiming an erroneous outcome of a disciplinary proceeding. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994) (recognizing Title IX claims for erroneous outcome and selective enforcement). The Fifth Circuit  also identifies various Title IX concepts relating to civil lawsuits. See e.g., *Oliver v. Univ. of Tex. Sw. Med. Sch.*, 2019 U.S. Dist. LEXIS 21289, * 53-58 (Tex. N.D. 2019).  In Oliver, the court recognized that: To state a viable "erroneous outcome" claim, a plaintiff must (1) "allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding;" and (2) show that "gender bias was a motivating factor behind the erroneous finding." Id. (emphasis added).

In *Oliver* the plaintiff, the alleged harasser, was a medical student who was expelled by The University of Texas Southwestern Medical School ("UTSW") after a Title IX proceeding was initiated by his former girlfriend.  Oliver's girlfriend accused him of physically assaulting her. Oliver denied the allegations and eventually sued.  Oliver alleged due process claims against all defendants under 42 U.S.C. §1983, gender discrimination in violation of Title IX, and First Amendment claims against defendants.

Oliver argued that UTSW process lacked due process and showed bias. *Oliver* at *1-2.  The court acknowledged the impact that "evidentiary weaknesses," including "particularized strengths of the defense," reasons to doubt the charges, failing to require testimony of the girlfriend, lack of reference to any exculpatory facts, mitigating factors, lack of effort to compile all the evidence, and

never giving access to the alleged incriminating evidence could impact the Title IX process and allow for the "inference of gender bias in the [viable] erroneous outcome."   See *Id*. at *53-58. In *Oliver*, the court also found it "troubling" that the investigator did not investigate evidence she came into possession of, including statements made to the police by a woman accuser. *Id*.

Plaintiff's allegations satisfy the "erroneous outcome" theory based on the general proposition that UNT failed to properly investigate and process the allegations, and if it properly had then the outcome would have been different. Further, Plaintiff's allegation satisfy the requirement that "gender biases as a motivating factor."

A. <u>Articulable Doubt</u>.

Because of the unique facts and evidentiary weaknesses of UNT's case against Dr. Trudeau, in particular because the comments were made in class, Plaintiff has met the pleading burden for the first element. A plaintiff may allege "particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge." *Yusuf*, 35 F3d at 715.   In *Doe v. Univ. of Miss*., 361 F. Supp. 3d 597, 2019 U.S. Dist. LEXIS 7490, 2019 WL 238098, at *5 (S.D. Miss. Jan. 16, 2019), the court found that the Title XI Coordinator's lack of effort in compiling all the evidence, including exculpatory evidence, before expelling the plaintiff was enough in part to state a plausible claim of gender bias.

Plaintiff has alleged facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding to include, but not limited to, the following:

> UNT gave erroneous information;  ¶ 6.20 Complaint.
> UNT failed to investigate the motivations of the complaint(s);  ¶¶ 6.16, 6.38 Complaint.
> Plaintiff was prohibited from questioning the complainant; ¶¶6.38 and 22 Complaint.

UNT did not consider or factor the type of class at issue; ¶¶ 6.01-6.03, 6.38
UNT did not require the complainant(s) or witnesses to appear; ¶¶ 6.38 and 22
UNT did not enforce its own rules and procedures; ¶ 6.38 Complaint.
The charges against Plaintiff significantly changed; ¶¶ 6.18, 6.36, 6.38 Complaint.
UNT delayed the investigation; ¶¶ 6.10 – 6.11, 6.38 Complaint.
UNT violated Plaintiff's right to confidentiality.  ¶ 6.21 – 6.23 Complaint.
Plaintiff was required to "appeal" to the same person charged him; ¶ 6.37 Complaint.
UNT failed to use the information from Plaintiff; ¶¶ 6.12–6.15, 6.30 & 6.38
UNT did not inform the Plaintiff of the allegations until several months;  ¶¶ 6.10-6.11,  and 6.38 Complaint.
UNT failed to take into consideration the fact that Plaintiff brought the matter to the attention of UNT;  ¶ 6.04 Complaint.
UNT's "findings" were not a part of the original complaint or that the students comments in the evaluations directly contradicted the claims; ¶ 6.06 Complaint.
UNT determined that Plaintiff violated policies relating to the disability of some unidentified student even though UNT never brought it to his attention or gave him notice and opportunity to respond; and UNT failed to bring the alleged disability status to his attention, or provide an "accommodation" for the student during the semester while the class met;  ¶6.29 – 6.30 Complaint.
UNT's lack of effort to obtain all of the evidence, including exculpatory evidence; ¶ 6.38 Complaint.
The charges against Plaintiff significantly changed from inception; ¶¶ 6.18, 6.36, 6.38 Complaint.
UNT was cavalier about following its own rules, procedures and meeting its deadlines; and gave misleading and false information about the process; ¶¶ 6.07 – 6.11, 6.13 - 6.14, 6.21, 6.23 - 6.24, 6.32 - 6.33, 6.38 and 12 Complaint.

 B. Gender was a Motivating Factor.

The second criterion is whether or not the Plaintiff's lawsuit contains particularized facts to satisfy his pleading burden of showing that gender was a motivating, not only, factor in this erroneous outcome. *Yusuf*, 35 F3d at 715 (noting that "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender" can satisfy the plaintiff's burden to show gender bias)("an unlawful employment practice is established when . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated the practice").  Unquestionably, a few allegations, "such as statements reflecting bias by members of the tribunal, may suffice both to cast doubt on the

accuracy of the disciplinary adjudication and to relate the error to gender bias." *Id*.

To show that gender was a motivating factor in the erroneous outcome, Plaintiff asserted, among other things, that:

> Plaintiff was referred to as a "straight white male; ¶ 6.23 Complaint.
> UNT failed to address or consider the motivations of the complaint(s); ¶¶ 6.16, 6.38
> Plaintiff was denied his right to question the women; ¶¶ 6.38, 22 Complaint.
> UNT would not permit the complainant(s) to appear at any proceeding; ¶¶ 6.38, 12 Complaint.
> Plaintiff, a male, combined with the gender of the supposed "victims," all women, resulted in UNT to take the women's testimony as truthful; ¶¶ 6.38 and 12
> The female complainant(s) was overwhelmingly favored; ¶ 6.36 Complaint.
> UNT based the punishment in part  due to their flawed belief that Plaintiff had previously received sexual harassment training when he had not; ¶ 6.38 Complaint.
> All students received "A's" for their efforts in the class and not once did any student inform Plaintiff about any issues or problems in the class. ¶ 6.35 Complaint.

The inference of gender bias in the erroneous outcome can be extrapolated from fact that the complainant(s) was tremendously favored and "protected" throughout the entire process, all to the detriment of Plaintiff. Plaintiff was not provided an opportunity to present any evidence on his behalf, or given an opportunity to seek advice and assistance from a faculty advocate, as required by UNT policies.  Further, the Chair of Plaintiff's department told Plaintiff that he discussed the matter with another while charges were pending because the other person was "just another straight white male." ¶ 6.23.  The Court should also recall that the Chair was the one who had final decisioning-making authority. ¶¶ 6.22-6.24; 6.37.

The inference of gender bias in the erroneous outcome scenario is further exacerbated by the fact that Plaintiff was never given access to the alleged incriminating evidence against him. Further the alleged victim(s) was not required to testify against him, or even appear for any proceeding, which significantly limited Plaintiff's ability to mount any defense.

At this stage of litigation, Plaintiff must "nudge[ his] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 547. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the **reasonable inference** that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (emphasis added). This plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a **reasonable expectation that discovery will reveal evidence of"** the claim. *Twombly*, 550 U.S. at 556 (quoted in *In re S. Scrap Material Co.*, LLC, 541 F.3d 584, 587 (5th Cir. 2008))(emphasis added). Regardless, even if a plaintiff fails to state a claim, "a plaintiff's failure to meet the specific pleading requirements should not automatically or inflexibly result in dismissal of the complaint with prejudice to re-filing." *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000) (citation omitted).

As stated above, Bell and Brodie concluded that the sustained allegations or comments because they:

> were unwelcome because they embarrassed the students, and caused them to be quiet in class, they were unrelated to the course materials, substantially interfered with the students' academic performance because they rarely participated in class discussions and performances as they were scared of what inappropriate comment or statement of a sexual nature that Plaintiff would say to them individually or collectively .

First, Plaintiff provided evidence that the students did not suffer any ability to participate in class discussions or performances. All students received "A's" for their efforts in the class and not once did any student inform Plaintiff about any issues or problems in the class while the class was in session. Second, in addition to the above, the allegations made against Plaintiff were baseless and did not violate the university's policies or federal law as the "allegations" were not "severe, persistent, or pervasive," the definition used by UNT, to have interfered with the complaining

students' ability to participate in or benefit from the class. In fact, as just one example, it was determined that two of the allegations were unsubstantiated.

Third, as one more example, Plaintiff was not removed by UNT during the time the alleged conduct supposedly occurred.  Discovery will also demonstrate that Plaintiff had taught the same class for several years and did not receive any complaints, and given received excellent reviews by prior students. These three facts would support the contention that the conduct did not violate UNT policies.

Dr. Trudeau was entitled to some semblance of a process consistent with Title IX principals. He never participated in a hearing that determined "guilt." Instead, he simply replied to the allegations by UNT. At no time was he given an opportunity to examine the complainant, or submit questions in writing for her/them to answer. It is undisputed that a Title IX proceeding was initiated by UNT. It is also undisputed that Plaintiff was not provided the requirement of Title IX with regard to investigations and hearings. UNT wants the Court to ignore its violations by arguing that Plaintiff can never be retaliated against under Title IX.

## II.    First Amendment.

Defendants argue that two (2) elements of a First Amendment Retaliation claim are absent in this case. First, Defendants claim that Plaintiff's classroom speech demonstrated that he was speaking pursuant to his official job duties. Second, Defendants claim that the same classroom comments of Plaintiff did not involve matters of public concern. Defendants do not address any of the remaining elements of Plaintiff's First Amendment claims. However, Defendants do not correctly apply the appropriate standard in this case, and fail to address the "academic exception."

<u>A. Official Duties</u>.

Although public university professors are public employees, they are held to a different standard. To establish a § 1983 claim for violation of the First Amendment right to free speech, teachers and professors must show that (1) they were disciplined or fired for speech that is a matter of public concern, and (2) their interest in the speech outweighed the university's interest in regulating the speech.  See *Connick v. Myers*, 461 U.S. 138, 147-50, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968); Martin v. Parrish, 805 F.2d 583, 584 (5th Cir. 1986). The first question, asking whether the professor's speech is protected as a matter of public concern, is a question of law. Defendants do not address or brief the second question.

In this matter, Defendants also incorrectly claim that Dr. Trudeau's classroom comments were a part of his "official duties" simply because he made them while in the midst of teaching, and therefore he had—implicitly still does not have—no First Amendment protection.  Again, as is abundantly clear, Defendants fail to take into account the fact that Dr. Trudeau was a professor who made comments during a class he was teaching.  The sexual harassment allegations were claimed to be made by Plaintiff during class while he critiqued the performance of the students.

Although there is not an absolute "exception" per se to the "public employee test" requirement in the education field, the history is clearly established.  While the Supreme Court did not expressly exempt speech related to teaching from the public employee test, the majority recognized a fear raised by the dissent about applying *Garcetti's* holding "to teachers at public colleges and universities." *Garcetti v. Geballas*, 547 U.S. 410, 425 (2006).  The majority in *Garcetti* expressly declined to decide this issue, stating:

There is some argument  that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence. We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching.

*Id.* at 425.

It is clear that the general rule is that "speech made pursuant to a public employee's official duties" is not protected by the First Amendment. *Anderson v. Valdez*, 845 F.3d 580,593(5thCir. 2016) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 419, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006)). However, "a public employee does not speak pursuant to his official duties merely because he speaks while at work. Likewise, a public employee does not speak pursuant to his official duties because he speaks about work." *Id.* (emphasis added).

In adopting these guidelines, the Fifth Circuit has noted that speech regarding "'internal personnel disputes and working conditions'" will not ordinarily involve the public concern. *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (quoting *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001)); see also *Rushing v. Bd. of Supervisors of the Univ. of La. Sys.*, 2011 U.S. Dist. LEXIS 139949 at * 15-19,  2011 WL 6047097 (M.D. La. 2011) (the six challenged claims being made by the plaintiff here fall into the extreme example of personnel decisions for which no First Amendment protection is recognized and fall far from the mark required for  protected academic speech). *Id.*

In the matter currently before the Court, the speech at issue relates to the "content and context" of the classroom teaching environment and therefore is not a matter of Dr. Trudeau's "official duties." The focus of this inquiry is not on the content of the speech, but on "the role the speaker occupied when [she] said it." *Davis v. McKinney*,  518 F.3d 304 (5th Cir. 2008) (quoting

*Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 692 (5th Cir. 2007)).  The difference is between

"speech that is 'the kind of activity engaged in by citizens who do not work for the government,' . . .

and activities undertaken in the course of performing one's job." *Williams*, 480 F.3d at 693 (quoting

*Garcetti*, 126 S. Ct. at 1962).

A number of factors guide a court in determining whether an employee is speaking pursuant

to his official duties: the relationship between the topic of the speech and the employee's job;

whether the employee spoke internally up the chain of command at her workplace; and whether the

speech resulted from special knowledge gained as an employee. See *Davis*, 518 F.3d at 312-14; see

also *Gentilello v. Rege*, No. 3:07-CV-1564-L, 2008 U.S. Dist. LEXIS 50745, 2008 WL 2627685, at

*3 (N.D. Tex. June 30, 2008). Whether an employee  is speaking as a citizen or pursuant to her

employment is a question of law for the Court to resolve, even though it "involves the consideration

of factual circumstances surrounding the speech at issue." *Charles*, 522 F.3d at 513 n.17.

B. Public Concern.

In *Cohen v. San Bernardino Valley College*, a student filed a grievance of sexual harassment

against a tenured professor, and the college's grievance committee found that "he had violated the

college's new policy and had created a hostile learning environment by his sexually oriented teaching

methods." 92 F.3d 968 (Ninth Cir. 1996).   Cohen had taught since 1968.  He claimed that he was

punished for his classroom speech under the college's sexual harassment policy which gave him

insufficient notice[1] that his conduct was prohibited, and that his rights to free speech, academic

freedom, and due process were violated. *Id*. at 970.

---

1 It should also be mentioned that although Cohen was threatened with suspension or termination for any future violation, Cohen only claimed insufficient notice and did not allege that he was retaliated against, i.e., he continued to teach and suffered no tangible harm at that time. In this case, in addition to his First Amendment claims, Plaintiff has

The relevant complaint in *Cohen* was as follows:

> The student became offended by Cohen's repeated focus on topics of a sexual nature, his use of profanity and vulgarities, and by his comments which she believed were directed intentionally at her and other female students in a humiliating and harassing manner. During this class Cohen began a class discussion on the issue of pornography and played the "devil's advocate" by asserting controversial viewpoints.

*Cohen* at 970.

The Ninth Circuit Court of Appeals held that the college's sexual harassment policy was "too vague as applied to punish teaching methods that Cohen had been using for many years," and reversed in part the judgment of the district court and remanded the case so that that the officials of the College would be enjoined from punishing Cohen, under the policy. *Id*. at 972. The court reasoned that "Cohen was simply without any notice that the policy at issue would be applied in such a way as to punish his longstanding teaching style—a style which, until the College imposed punishment upon Cohen under the Policy, had apparently been considered pedagogically sound and within the bounds of teaching methodology permitted at the College." *Id*.

Also, the court looked at the language in the context of teaching and found that Cohen had "typically assigned provocative essays such as Jonathan Swift's 'A Modest Proposal' and discussed subjects such as obscenity, cannibalism, and consensual sex with children in a 'devil's advocate' style." *Id*.  One example provided the context of Cohen's teaching style:

> During classroom discussion on pornography in the remedial English class in the Spring of 1992, Cohen stated in class that he wrote for Hustler and Playboy magazines and he read some articles out loud in class. Cohen concluded the class discussion by requiring his students to write essays defining pornography. When Cohen assigned the "Define Pornography" paper, Ms. M asked for an alternative assignment but Cohen refused to give her one.

*Id*.

---

also alleged that the sexual harassment policy at issue was "vague and failed to provide him sufficient notice that the alleged conduct he has utilized for many years violated UNT policy." § 32 Complaint.

The Fifth Circuit also has provided similar analyses for free speech claims made in and out of the classroom by professors.  For example, in *Buchanan v. Alexander*, 919 F.3d 847 (Fifth Cir. 219), the Court analyzed certain comments and actions of the plaintiff allegedly made in the classroom. The professor asked a student about her sexual relationship with her fiancé; recorded another student crying during; stated that "a woman is thought to be a dike if she wears brown pants"; stated that "it was a choice to be in the program and it was not the fault or problem of the professors if any of us chose to be mommies or wives and not to expect to get an A in the class; and she used of "extreme profanity on a regular basis."  *Id*. at 851.  Complaints were also made from a local public school district while she visited elementary school teachers in his district. *Id*.

The Fifth Circuit analyzed the case from the context that public university professors. Nevertheless,  the Court noted that in order to "establish a § 1983 claim for violation of the First Amendment right to free speech, public university professors must show that (1) they were disciplined or fired for speech that is a matter of public concern, and (2) their interest in the speech outweighed the university's interest in regulating the speech.2 The first question, asking whether the professor's speech is protected as a matter of public concern, is a question of law. *Id*. at 853 Since Defendants fail to argue or brief the second question <u>in this case</u>, they should not now be permitted to argue or address this issue. *Moss v. Princip*, 913 F.3d 508, 2019 U.S. App. LEXIS 1453 (5th Cir. 2019)("the failure to reference or cite any authorities in their 'opening' brief before the district court, waives the matter and fatally impairs any appellate challenge.).

The *Buchanan* Court also correctly recognized that "if  Dr. Buchanan did not speak as a citizen on a matter of public concern, then she has no First Amendment claim for LSU's response to

---

2 See *Connick v. Myers,* 461 U.S. 138, 147-50, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); P*ickering v. Bd. of Educ*., 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968); *Martin*, 805 F.2d at 584.

her speech." *Buchanan* at 853.

> [W]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record. Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community. When a public employee speaks in his capacity as an employee and on personal matters, rather than in his capacity as a citizen on a matter of public interest, his speech falls outside the protection of the First Amendment. A mere element of personal concern, however, does not prevent finding that an employee's speech as a whole includes a matter of public concern.

*Id.*

The court agreed that the speech at issue **was not related to the subject matter or purpose of training Pre-K-Third grade teachers**. The court also recalled that it had held in prior cases where "in the college classroom context, speech that does not serve an academic purpose is not of public concern." *Id*. at 853.   The court also cited to the *Cohen v. San Bernardino Valley College*. *See above*.  However, the court found that Dr. Buchanan's speech from Professor Cohen' speech, emphasized that the use of use of "profanity and discussion of controversial viewpoints was 'at least tangentially related' to teaching college-level English." *Id*. at 854.  In *Buchanan* court recognized that "the use of profanity and discussion of professors' and students' sex lives by Dr. Buchanan were clearly not related to the training of Pre-K-Third grade teachers.

The *Buchanan* court also cited to several cases where the "content, form and context" was important to evaluate a free speech claim; see also *Martin*, 805 F.2d at 585 (holding that a professor's use of profanity to castigate his students was not a matter of public concern because it served **no academic purpose**)(emphasis added); *Bonnell v. Lorenzo*, 241 F.3d 800, 820 (6th Cir. 2001) (holding that a professor "may have a constitutional right to use words such as 'pussy,' 'cunt,' and 'fuck,' but he does not have a constitutional right to use them in a classroom setting where they are **not germane to the subject matter"**)(emphasis added);  *Dambrot v. Central Mich. Univ.,* 55 F.3d 1177, 1190 (6th Cir. 1995) (holding that "[a]n instructor's choice of teaching methods does not

rise to the level of protected expression"); cf. *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 682 (6th Cir. 2001) (holding that a professor's right to use vulgarity and racial slurs during analysis of the historical use of oppressive and marginalizing language was protected speech), see below; *Kerr v. Hurd*, 694 F. Supp. 2d 817, 842-43 (S.D. Ohio 2010) (holding that discussion and advocacy of a medical technique during classroom instruction was a matter of public concern because it was relevant to a national debate on best practices for delivering babies); and *Cohen*, 92 F.3d 968 (9th Cir. 1996) (discussing discipline of a college professor for his use of profanity, discussion of pornography, and **assertion of other controversial viewpoints during class discussion** in a college-level English class)(emphasis added).   In *Buchanan*, the Court concluded that since Dr. Buchanan's speech was not a matter of mater of public concern, it is unnecessary for the court to scrutinize the reason for the discipline. *Id.* at 853.

The *Hardy* case above relied on by the *Buchanan* Court is also instructive in the type of First Amendment Claim asserted by Dr. Trudeau. In *Hardy v. Jefferson Cmty. College*, 260 F.3d 671 (6th Cir. 2001), Kenneth Hardy, a Caucasian adjunct instructor that alleged retaliation for exercising his constitutionally protected right of free speech following a classroom discussion examining the impact of oppressive and disparaging words in society as "nigger' and 'bitch." One of Hardy's African-American students complained.   The *Hardy*  court held that the  professor's right to use vulgarity and racial slurs during analysis of the historical use of oppressive and marginalizing language was protected speech.

Since *Garcetti*, courts continue to evaluate the "content and context" of the speech. Generally, courts look at whether the speech was related to the **administration of or ministerial matters**. For example, speech "made within the chain of command" and "related to [Plaintiff's] job, which are both factors that [the Fifth Circuit] has previously considered in determining  that speech

was made as an employee and not as a citizen." See *Caleb v. Grier*, 598 F. App'x 227, 236-37 (5th Cir. 2015); *Wetherbe v. Smith*, 593 F. App'x 323, 328 (5th Cir. 2014) (per curiam). See also *Davis*, 518 F.3d at 313 ("Cases from other circuits are consistent in holding that when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job."). Still more, administrative or internal governance matters are not protected. *Emergency Coal. To Defend Educ. Travel v. US Dep't of the Treasury*, 545 F.3d 4, 19-20  (D.C. Cir. 2008).

Speech on a "matter of public concern" is broadly defined as speech that can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Snyder v. Phelps*, 562 U.S. 443, 453, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011) (quoting *Connick*, 461 U.S. at 146). In making this determination, a court must consider the "content, form, and context" of the speech in light of all of the circumstances of the speech, including "what was said, where it was said, and how it was said." *Id.* at 453-54. See also *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004)(quoting *Connick*, 461 U.S. at 147-48). No one of these three factors is dispositive. *Snyder*, 562 U.S. at 454. The entire speech need not address a matter of public concern, so long as some portion of the speech does. *Farhat*, 370 F.3d at 589 (citing *Connick*, 461 U.S. at 149).

The Fifth Circuit has recognized "three reliable principles" derived from its case law regarding whether public employee speech is made as a citizen on a matter of **public concern**. First, the speech's content may relate to the public concern if it does not involve solely personal matters [of the professor] or strictly a discussion of management's policies that may be only interesting to the public by benefit of the manager's status as a division or arm of the government. Second, it  is not required that the speech be made to the public, but it may relate to the public concern if it is made against the backdrop of public debate. And, third, the speech cannot be made in furtherance of a

personal employer-employee dispute if it is to relate to the public concern. *See Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 372 (5th Cir. 2000) (citing cases), abrogated on other grounds by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562-63, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

In this case, the Plaintiff had been teaching this class with the same techniques for several years. In fact, as discovery will demonstrate, he had also taught the class to undergraduate students since 2015 with no complaints and that he currently teaches the same class with no restrictions. . Further, the student evaluations for this class, prior to the Fall 2017 Semester, were significantly higher.

## III.    **Constitutional Claims**.

"Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." *Shuman v. Penn Manor School Dist*., 422 F.3d 141, 146 (3d Cir. 2005).  The Fourteenth Amendment provides that no person shall be deprived "of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. The Fourteenth Amendment protects both procedural and substantive due process. Procedural due process ensures that state actors utilize the required and fair procedures before they can deprive someone of a life, liberty, or property interest. *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18(1976). Thus, a prerequisite to stating a procedural due process claim is that a life, liberty, or property interest be at stake. See *Bd. of Regents v. Roth*, 408 U.S. 564, 569-71, 92 S. Ct. 2701, 33 L. Ed. 2d 548(1972).

A.  Qualified Immunity.

A government official is entitled to qualified immunity "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Id. (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 735, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)).  "A state official in his or her official capacity, when sued for injunctive relief, would [still] be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Id*. 71 & n.10 (emphasis added); *Oliver* at *14-15 (citing *Ex parte Young*, 209 U.S. 123, 159-160, 28 S. Ct. 441, 52 L. Ed. 714 (1908)). Therefore, Plaintiff's Section 1983 claims should proceed against the three (3) UNT employees at least in their official capacities for prospective injunctive relief. But also in their individual capacities for damages.

Although a court is to decide the issue of qualified immunity as early as possible, *Anderson v. Creighton*, 483 U.S. 635, 646 n.6, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987), it would be a failure of justice for this Court to rule on this matter without all of the pertinent facts. Therefore, if the Court believes that is the case here, the Court should undertake the "careful procedure." The Fifth Circuit "has established a careful procedure under which a district court may defer its qualified immunity ruling if further factual development is necessary to ascertain the availability of that defense." *Backe*, 691 F.3d at 648.

B.    Clearly Established.

The Fifth Circuit explained that when a court is determining whether a law or right is "clearly established" it is to do so based on the following guiding principles:

> When considering a defendant's entitlement to qualified immunity, we must ask whether the law so clearly and unambiguously prohibited his conduct that every reasonable official would understand that what he is doing violates [the law]. To

answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority*3*]—that defines the contours of the right in question with a high degree of particularity. . . . Further, the Supreme Court has held that generalizations and abstract propositions are not capable of clearly establishing the law]. . . . Although the Supreme Court has repeatedly admonished courts not to define clearly established law at a high level of generality, this does not mean that a case directly on point is required. Rather, existing precedent must have placed the statutory or constitutional question beyond debate. The sine qua non of the clearly-established inquiry is fair warning.

*Oliver* at *43-44.

Here Defendants do not contest that they were acting under color of state law. Further, qualified immunity, if applicable, would shield government officials only from monetary damages in their individual capacities, and not lawsuits for injunctive relief in their official capacities. *Morgan v. Swanson*, 659 F.3d 359, 401 (5th Cir. 2011).

C.    Due Process.

Due process is "a flexible concept that varies according to the situation." *Sharp v. Lindsey*, 285 F.3d 479, 487 (6th Cir. 2002). Courts are to consider the competing interests of the parties, specifically the seriousness of the claimant's deprivation, the burden on the public entity, and the risk of erroneous outcome. *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). "The fundamental requirement of due process is an opportunity to be heard at a meaningful time and in a meaningful manner." *Id*. at 334. The Supreme Court has regularly held that "some form of hearing is required before an individual is finally deprived of a property interest. *Id*. at 333. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id*., citing *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). See also *Grannis v.*

---

3 The Fifth Circuit clarified however that "[i]n a situation where no 'directly controlling authority' prohibits the defendants' conduct, we look to the law of other jurisdictions 'in assessing whether a reasonable [official] would have known . . . that his conduct was unlawful.'" *Morgan*, 659 F.3d at 372 n.26 (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 329 (5th Cir. 2002) (en banc)).

*Ordean*, 234 U.S. 385, 394 (1914).

Plaintiff was never given the opportunity to review the information collected.  Plaintiff was not provided an opportunity to question the complainants or submit written questions to them to answer. On more one occasion, Plaintiff did not learn of  a newly added charge until after the "decision" was made.  Plaintiff was provided a meaningful opportunity to be heard.  He was met with multiple statements from Defendants during the "process" that the known and relied on UNT grievance policies and procedures no longer existed. See e.g., ¶¶ 6.07-6.11, 6.13-6.14 C.

Regarding the requirement of <u>protected or property interests</u>, Plaintiff has alleged that he has

> . . . already lost a graduate student who had asked that another faculty member to be his chair after he improperly heard about the allegations. This too damaged Plaintiff's teaching score and also impacted him financially by way of merit allocation, as well has the removal of class for him to teach. These negative impacts occurred—and continue even today—while the investigation was ongoing and Plaintiff had no means to defend himself to the department or to the Chair of the department, who acted in his dual role as chair and "complainant." To date, no other graduate student has asked the Plaintiff to serve as a major advisor, which further impacted the Plaintiff's teaching score.

§§6.27 and 10 Complaint.

In *Smock v. Bd. of Regents of the Univ. of Mich.*, 353 F. Fupp. 3d 651, 657 (E.D. MI. 2018) the court held that "Plaintiff has adequately alleged, however, that her role as an advisor to graduate students is necessary to her scholarship and her standing in the academic community. A change of job duties can be something much more when it both stigmatizes the employee and forces her to work beneath her station." In *Smock*, plaintiff's students had complained that she had made inappropriate jokes and had inappropriate conversations with them of a sexual nature. Plaintiff denied the allegations and brought changes of violation of the First and Fourteenth Amendment rights when the university sanctioned her. *Smock* held that plaintiff also had pled the deprivation of a constitutionally protected property interest in her sabbatical leave and graduate student mentorship.

*Id* at 657.  The issue then becomes whether the process provided by the University was sufficient under C*leveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).

The Supreme Court also has recognized that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of the [Due Process] Clause must be satisfied." *Goss v. Lopez,* 419 U.S. 565, 575, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975)(the charges could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment). Defendants are correct that harm to reputation, by itself, is not a deprivation of liberty in the context of due process.

Here, there is more than that Dr. Trudeau's  professional reputation at stake. Action at UNT have currently caused him to lose a graduate student who asked that another faculty member be his chair after he improperly heard about the allegations prior to the lawsuit; has suffered lowered teaching scores which have impacted him financially by way of merit allocation,  as well has the removal of a class from him, he was reprimanded, and suffered harm to his reputation now and for all future endeavors.

D.    Free Speech.  Defendants fail to consider the "content, form and context" of the speech at issue. They provide authority  that does not address the facts of this case, i.e., the First Amendment and academic freedom.  The cases Defendants rely on are easily distinguishable from this case.  Free speech in academia has been clearly established since at least 1980. Classroom discussion is a protected activity.  The Fifth Circuit joined "the First and Sixth Circuits in holding that classroom discussion is protected activity. *Kingsville Independent School Dist. v. Cooper*, 611 F.2d 1109, 1113, 1980 LEXIS 20424 (5th Cir. 1980), citing *Minarcini v. Strongsville City School*

*District*, 541 F.2d 577 (6th Cir. 1976); *Keefe v. Geanakos*, 418 F.2d 359 (1st Cir. 1969). Plaintiff

provides authority above in *Cohen, Buchanan, and Hardy* of what the  limits are, i.e., where the

speech is "at least tangentially related" to the course then the speech is protected. Buchanan  at 854.

> Further, the Supreme Court declared more than thirty years ago:

> Our Nation is deeply committed to safeguarding academic freedom, which is of
> transcendent value to all of us and not merely to the teachers concerned. That
> freedom is therefore a special concern of the First Amendment, which does not
> tolerate laws that cast a pall of orthodoxy over the classroom. The vigilant protection
> of constitutional freedoms is nowhere more vital than in the community of American
> schools.

*Keyishian v. Bd. of Regents*, 385 U.S. 589, 602-03, 17 L. Ed. 2d 629, 87 S. Ct. 675 (1967) (internal
citations and quotation marks omitted).

There is no doubt that the right allegedly violated in this case, based on the freedom of

speech in academia and protected by the First Amendment is one of our most fundamental and

established constitutional rights. For decades it has been clearly established that the First

Amendment tolerates neither laws nor other means of coercion, persuasion, or intimidation "that cast

a pall of orthodoxy" over the free exchange of ideas in the classroom.

    E.    Equal Protection.

Plaintiff alleges in Count Four that female UNT employees suffer no historical

disadvantage regarding sexual misconduct allegations which would allow UNT and its employees to

validly discriminate against male employees like Dr. Trudeau.  But also the allegations  establish that

both "sides" of the investigation were not treated equally and were not provided equivalent rights,

i.e., it was one-sided.  "[T]he Equal Protection Clause is implicated when the government makes

class-based decisions in the employment context, treating distinct groups of individuals categorically

differently." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 605, 128 S. Ct. 2146, 170 L. Ed. 2d 975

(2008)). Plaintiff believes  discovery  will  demonstrate  that  UNT  male  employees  are  treated

differently where the issue is sexual harassment, and asserts that female employees so no or little accusations of sexual harassment verses male employees, in particular male professors.  Therefore, Plaintiff requests that he be permitted limited discovery for this allegation.

       F.     <u>Statutory or Constitutional Right</u>.

Plaintiff alleges that Defendants have violated his First Amendment right to free speech, his Fourteen Amendment right to due process, and his Fourteenth Amendment right to equal protection, and that his pleadings are adequate by identifying his rights.

## IV.    **Title VII.**

Plaintiff does not bring any claims covered by Title VII, nor does he intend to so allege. Further, Title VII does not preempt a Title IX retaliation claim when the alleged retaliation occurs as a consequence of the claimant's participation in investigations challenging alleged violations of Title IX. *Lowrey v. Texas A & M Univ. Sys.,*  117 F.3d at 242, 247-249 (5th Cir. 1997) (Lowery asserted a cause of action for retaliation that arose exclusively under title IX, without a corollary right under title VII).  Accordingly, the *Lakoski* preemption cited by UNT does not apply here.

UNT  initiated an OEO proceeding against Plaintiff which took approximately one and one-half (1 ½) years.   In *Lowrey*, the Fifth Circuit affirmed the dismissal of an employment discrimination under title IX, it reversed a retaliation claim under Title  IX.  *Lowrey* @ 254.  The Fifth Circuit  was clear when it reasoned that an implied private right of action for retaliation under title IX does not signal a retreat from the doctrine of *Lakoski*. In Dr. Trudeau's case we decide whether or not the employees of federally funded educational institutions who raise complaints, or participate in investigations, concerning compliance with the substantive provisions of Title IX are protected from retaliation by 34 C.F.R. § 100.7(e) and enjoy an implied private right of action for money damages to vindicate their rights under Title IX. *Id.*

Plaintiff does not allege any employment discrimination claims in the context of a Title VII claim. It is undisputed that a Title IX investigation was initiated by UNT against Plaintiff. At no time did Plaintiff ever initiate any Title VII activities, e.g., filing a complaint with the E.E.O.C. Further, Plaintiff and the complainants did not have an employment connection.  The only actions, including retaliatory acts,  Defendants brought related to Plaintiff's participation in a Title IX investigation. Plaintiff alleges that he was retaliated against for his participation in a Title IX investigation.

The  *Slabiaak*  and *Lakoski* relied on by Defendants are clearly distinguishable.  In *Slabiaak* the plaintiff alleged she experienced continuous verbal, physical, and sexual harassment." *Id* at *1-2. Plaintiff relies exclusively on his allegations charging UNT with violations of Title IX,  not Title VII.  *Slabisak* at *5.

In *Lakoski*, the plaintiff was denied promotion multiple times and was no longer considered for tenure in the future, even though she was offered another position with a significant pay increase but she declined it. *Id*. at 752.  She filed a claim for "intentional sex discrimination in violation of Title IX." *Id*.  Even though there were no OEO or other proceedings which implicated Title IX, the plaintiff attempted to assert such claim. Ultimately, the Fifth Circuit held that Title VII is the exclusive remedy for individuals alleging employment discrimination on the basis of sex."  *Id.* at 753. Here, the complainants, students of UNT, brought the charges against Plaintiff, their professor, and then UNT commenced a Title IX investigation. Plaintiff does allege that he was the victim of retaliation by UNT while the EEO process occurred due to his gender.  The factual allegations of Plaintiff's live pleading, paragraphs §§6.01 – 6.38 are clear indications of this retaliation.

The Fifth Circuit in *Laboski* also limited its holding to cases where Title VII provides a remedy, expressing no opinion whether Title VII excludes suits seeking only declaratory or injunctive relief. *Id*. at 753.  Here, Plaintiff asks for injunctive relief in Counts 2 and 4.

Again, the matter at issue originally began as an Office of Equal Opportunity ("OEO") and brought by students of Plaintiff. UNT policies state:

> that Title IX Coordinator (940-565-2759) - UNT's Title IX Coordinator is housed in the Office of Equal Opportunity (Hurley 175). You may file any Title IX-related complaint with the Title IX Coordinator (including sexual assault and sexual harassment). The Office of Equal Opportunity will investigate the complaint if the accused party is a staff/faculty member, guest, or visitor to campus.  The Title IX Coordinator will also ensure your continued access to your educational program.

Causal connection/inference. Plaintiff's complaints relate specifically to the Title IX process and investigation.  Among other things, Defendants repeatedly applied different rules to Plaintiff, failed to provide adequate information, and prevented Plaintiff from sufficiently defending himself.

**Conclusion**

Taken in totality, and viewed most favorable to Plaintiff, the allegations suggest that the philosophy at UNT retaliated against Plaintiff and violated certain constitutional rights.  Therefore the Court should deny Defendant's motion to dismiss. In the alternative, allow Plaintiff to replead any matters determined by the Court to be deficient. Further the Court should allow discovery in those matters it deems appropriate.

THE LAW OFFICE OF MICHAEL P. KELLY


By: **/s/ Michael P. Kelly**
Michael P. Kelly
Texas Bar No. 11227280

P.O. Box 150589
Dallas, TX 75315
Telephone:  (214) 821-7255
Facsimile:  (214) 821-7251
E-Mail:  mptkelly@sbcglobal.net

**Attorney for Plaintiff**
Page 29 of 30

CERTIFICATE OF SERVICE

This is to certify that on 18 March 2020, I electronically transmitted the foregoing document to the Clerk of Court using the ECF system of filing, which will transmit a Notice of Electronic Filing to the following counsel for Defendants, an ECF registrant:

Ken Paxton
Attorney General of Texas
Matthew Bohuslav
Assistant Attorney General
Office of the Attorney General
Matthew.bohuslav@oag.texas.gov

/S/ MICHAEL P. KELLY
Michael P. Kelly